UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
ARTHUR N. ABBEY,            |

            |

          Plaintiff,     |     06 CV 409 (KMW)

            |

    -against-         |     <u>OPINION AND ORDER</u>

            |

3F THERAPEUTICS, INC.,    |

            |

         Defendant.    |
------------------------------------------------------X

Wood, U.S.D.J.:

Plaintiff Arthur N. Abbey brings claims against Defendant 3F Therapeutics, Inc. ("3FTI") based on federal securities fraud law and New York state common law of fraud and negligent misrepresentation. Plaintiff alleges that Theodore Skokos, an agent of 3FTI, fraudulently induced Plaintiff to make a $4 million investment in 3FTI—through a limited partnership, 3F Partners Limited Partnership II ("3F Partners")—by falsely stating that that 3FTI had two "firm offers" for a cash sale of the company that would result in a substantial return on Plaintiff's investment in a short amount of time. (Pl. Opp. at 1.) Plaintiff seeks to impose securities fraud liability upon 3FTI based on those alleged misrepresentations made by Mr. Skokos.

Defendant moves for summary judgment on all of Plaintiff's claims. For the reasons stated below, the Court finds that the disputed facts between Plaintiff and Defendant are not material, because, even when construing the evidence in the light most favorable to Plaintiff, Plaintiff's reliance on Mr. Skokos's alleged misrepresentations was not reasonable as a matter of law. Accordingly, the Court GRANTS summary judgment in favor of Defendant.

I.    <u>Background</u>

    A.    <u>Facts</u>

Unless otherwise noted, the following facts are derived from the parties' Local Rule 56.1 statements, affidavits, or other submissions, and are undisputed.  The Court construes all evidence in the light most favorable to the Plaintiff, and draws all reasonable inferences in the Plaintiff's favor.  In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008).

     1.    The Parties

        a.    Plaintiff

Plaintiff is an individual who resides in the state of New York.  (Def. 56.1 Stat. ¶ 1.)  He is an attorney who has been practicing securities litigation since 1967.  (Def. 56.1 Stat. ¶3.)  He is a frequent lecturer on securities law at institutions including Harvard Law School and the Practising Law Institute.  (Def. 56.1 Stat. ¶ 4.)   Plaintiff describes himself as "a leading practitioner in the field of securities, antitrust and consumer litigation," and as "an authority on class and complex litigation, securities fraud and corporate governance, [and] contests for corporate control."  (Def. 56.1 Stat. ¶¶ 5-6.)   The website for Plaintiff's law firm, which bears his name, states that "the Firm has prosecuted hundreds of securities class actions and derivative actions and has recovered billions of dollars for its clients and class members."  (Def. 56.1 Stat. ¶ 10.)  Plaintiff and his two children are sole shareholders of a corporation, Cellular Properties, that employs 100 people.  (Def. 56.1 Stat. ¶ 17.)

Plaintiff's adjusted gross income for 2003 was $3,500,000; for 2004 it was $6,600,000; and, for 2005 it was $2,900,000.  (Def. 56.1 Stat. ¶ 20.)  In 2005, Plaintiff's investment accounts had a total value of $31,446,992.62.   (Def. 56.1 Stat. ¶ 21.)  Plaintiff had additional investments totaling $18,664,363.  (Def. 56.1 Stat. ¶ 22.)

        b.    Defendant

Defendant 3FTI was a privately held Delaware corporation with a principal place of business in California.  (Def. 56.1 Stat. ¶¶ 2; 93.)  In September of 2006, 3FTI merged with ATS Medical, Inc. ("ATS Medical").  (Def. 56.1 Stat. ¶ 2.)

> 2.    Plaintiff's Communications with Mr. Skokos Regarding an Investment in 3FTI

Plaintiff's decision to invest in 3FTI was based on a series of conversations he had with Theodore Skokos, a founder and initial director of 3FTI.  (Def. 56.1 Stat. ¶¶ 11; 72, 90-91.)  Plaintiff knew Mr. Skokos, also a lawyer, because they had been co-counsel in several lawsuits, and because Mr. Skokos had identified an investment opportunity for Plaintiff in the past.  (Def. 56.1 Stat. ¶¶ 12, 17.)  At the time that Mr. Skokos and Plaintiff spoke about 3FTI, they were communicating "sporadically at best," which Plaintiff described as not "more than one [time] a year, at most two [times] a year."  (Def. 56.1 Stat. ¶ 18.)

Plaintiff and Mr. Skokos first discussed 3FTI on February 18, 2005.  (Def 56.1 Stat. ¶ 72.)  The parties dispute exactly what Mr. Skokos said to Plaintiff during that initial meeting.  Plaintiff states that Mr. Skokos told him that 3FTI had "two firm offers that valued the company at a hundred million dollars," and that he was calling Plaintiff "as a friend," with an investment opportunity that would be "very good" for him.  (Morrison Aff. Ex. C at 73: 4-10.)  Plaintiff alleges that Mr. Skokos described a closing as being "imminent," and that Mr. Skokos stated that the offerors were "seriously interested" parties who were "ready, willing and able" to make the purchase.  (Id. at 88: 2-3; 98: 7-18.)  Plaintiff alleges that Mr. Skokos told him that he was "fairly certain" that a transaction would close.  (Id. at 202: 7-9.)  Plaintiff further alleges that the "tenor" of what Mr. Skokos conveyed to him was, "[t]here is a deal that will be done, rather quickly here, and it will produce profit for everyone." (Id. at 99: 9-11.)  According to Plaintiff, Mr. Skokos conveyed to him that the "deal was so certain to happen, that [he] should just borrow the

money, put it in, and [he] would get it back in short order, and a profit," because "there would be

a closing in the very near future."  (Id. at 99: 14-16; 87: 23-25.)  Plaintiff states that Mr. Skokos

told him that his investment in 3FTI would prevent offerors for 3FTI from taking advantage of

the company, and would simply be "used for window dressing, to enhance 3F's position, that

such an investment would be short term, and that [Plaintiff] would realize a profit on [his]

investment."  (Id. at 73: 11-17.)

Mr. Skokos, however, states that he told Plaintiff that "we have a letter of interest" and

that "it's just a long process, and it takes time . . . [and that the offer] was [for] nine figures."

(Morrison Aff. Ex P at 58: 10 - 59: 5.)   Mr. Skokos states that he explained to Plaintiff that "the

process is beginning . . . what you can draw from this is I think we are in play."  (Id. at 59: 6-9.)

Mr. Skokos further testifies that he said to Plaintiff, "you know as well as anybody . . . that there

are no guarantees here." [1]  (Id. at 61: 2-6.)

During the course of several conversations following that initial meeting, Mr. Skokos

asked Plaintiff to invest $4 million in 3FTI.  (Morrison Aff. Ex. B at 3, ¶9.)  According to

Plaintiff, Mr. Skokos assured him that 3FTI "had enough cash and assets to meet its obligations

in the context that there would be a transaction in the short term, and [that] having an additional

$4 million in cash . . . would mean that it would have, not 4 million but 8 million."  (Morrison

Aff. Ex. C at 123: 9-15.)  Plaintiff states that he told Mr. Skokos that he was borrowing 100

---

[1] In a parallel action against 3FTI filed in the Delaware Court of Chancery on June 7, 2006,
Plaintiff describes his conversation with Mr. Skokos differently.  In the Delaware complaint,
Plaintiff alleges that Mr. Skokos told him that 3FTI was "negotiating with serious bidders" and
that "two potential purchasers had made offers to purchase all of [3FTI]."  (Morrison Aff. Ex. K
at 3, ¶ 7; 8, ¶ 18) (emphasis added).)  When asked at deposition in the instant matter about the
discrepancy between the terms "serious bidder" and "offers" (the terms used in his Delaware
complaint), and the term "firm offer" (the term used in the instant action), Plaintiff stated that,
for the purpose of the transaction at issue, he sees no difference between the terms "serious
bidder,"  "offer," and "firm offer."  (Morrison Aff. Ex. C at 201: 13-17; 206: 23 - 207: 4.)

percent of the money he was using to invest in 3FTI, and that he would need to get that money back in a very short period of time.  (Id. at 76: 3-9.)  According to Plaintiff, Mr. Skokos assured him that he would get the money back in "a very short amount of time," and that the investment would be "relatively riskless."  (Id. at 76: 9-11.)

Plaintiff asked Mr. Skokos for the identity of the offerors, but Mr. Skokos refused to tell him their identities, stating that he was "under a duty of nondisclosure" because the potential offerors were publicly traded companies.  (Morrison Aff. P at 57: 12-22; 62: 12-19.)  At that point, Plaintiff did not ask to see any non-disclosure agreement between 3FTI and any potential suitor,[2] or any of the offer letters that Mr. Skokos allegedly referred to in his conversations with Plaintiff.  (Def. 56.1 Stat. ¶¶ 63-64; 66.)  Plaintiff states that he never thought about whether an offer to purchase 3FTI would have been made in writing, because he "entirely relied on what [Mr. Skokos] told [him]."  (Def. 56.1 Stat. ¶ 65.)  Plaintiff "did not ask [Mr. Skokos] anything about the product, or the business, or the FDA status, or timing of the product or market for the product" that was being developed by 3FTI.  (Morrison Aff. Ex. C at 76: 12-14.)  Rather, Plaintiff "relied completely on [Mr. Skokos] saying that [Plaintiff's] investment was for window dressing and that it would be very helpful to him and the company if [Plaintiff] would make the investment quickly and at that time."  (Id. at 76: 14-18.)  Plaintiff states that he and Mr. Skokos did not discuss "any other details, other than [the fact that] there were firm offers to buy the company, and that the closing would be forthcoming in the near future."  (Id. at 85: 9-16.)

3.    Documentation Provided to Plaintiff

In March of 2005, Mr. Skokos provided Plaintiff with three documents containing information relevant to Plaintiff's decision about whether to invest in 3FTI.

---

[2] The parties dispute whether 3FTI actually had operating non-disclosure agreements with potential offerors.  (See Pl. 56.1 Response and Counterstat. ¶ 67.)

First, on March 23, 2005, Mr. Skokos sent Plaintiff the 3F Partners Limited Partnership II Agreement (the "Limited Partnership Agreement"), which provided that investors in 3FTI make their investment through a limited partnership entity, rather than directly purchasing 3FTI securities. (Morrison Aff. Ex. B, at 5, ¶¶ 16; 19.)  The Limited Partnership Agreement had been signed by Mr. Skokos, and included investors in addition to Plaintiff.  (Morrison Aff. Ex. O; Morrison Aff. Ex. B at 5, ¶ 19.)  The Limited Partnership Agreement included a provision that allowed Mr. Skokos to earn 20 percent of the profits earned by Plaintiff and the other investors. (Morrison Aff. Ex. O at 48, ¶ 9.3.)  It also included a disclaimer provision stating that the agreement "constitutes the full and complete understanding and entire agreement of the parties and <u>supersedes any and all other agreements, written or oral, with respect to the subject matter contained herein</u>."[3]  (Morrison Aff. Ex. O at 69, ¶ 17.5 (emphasis added).)

When asked at deposition whether he "had carefully read and [was] . . . familiar with the [Limited Partnership] agreement," Plaintiff responded "no."  (Morrison Aff. Ex. C at 106: 21-23.)  Plaintiff states:  "I'm not sure I even spent more than ten minutes looking at the agreement. Didn't concern me.  This was not an arms-length transaction where I needed a lawyer to protect myself.  I was dealing with a friend."  (<u>Id.</u> at 103: 17-22.)  Plaintiff also states that he did not read the provision of the Limited Partnership Agreement disclaiming his reliance on extra-contractual oral representations.  (<u>Id.</u> at 109: 2-4.)  Plaintiff chose to instead rely on Mr. Skokos's oral representations "due to a longstanding business relationship and friendship [with Mr. Skokos]."  (Pl. 56.1 Response and Counterstat. ¶ 47.)

---

[3] Plaintiff states that he "believe[s]" that he signed the Limited Partnership Agreement before investing in 3FTI.  (Morrison Aff. Ex. C at 101: 17-19.)  Neither Plaintiff nor Mr. Skokos has produced a copy of the Limited Partnership Agreement signed by Plaintiff.  Plaintiff now contends that, because "there is no proof that [he] signed the Limited Partnership Agreement," he did not make the representations contained in the Limited Partnership Agreement. (Pl. 56.1 Response and Counterstat. ¶ 52.)

On March 29, 2005, Mr. Skokos gave Plaintiff two 3FTI financial documents.  (Def. 56.1 Stat. ¶ 58.)  One was 3FTI's Operating Statement for December 2004 (the "Operating Statement").  (Morrison Aff. Ex. G.)  The Operating Statement states that 3FTI had a net loss in December 2004 of $799,256, and a net loss for year-to-date 2004 of $11,242,908.  (Id.) The other was a 3FTI Balance Sheet, dated December 31, 2004 (the "Balance Sheet"), which states that 3FTI's accumulated deficit had grown from $16,471,832 at the end of 2003 to $32,207,564 at the end of 2004.  (Id.)

Although Plaintiff acknowledges receiving both of those 3FTI financial documents, he states that he does not recall whether he even opened them, let alone reviewed them.  (Morrison Aff. Ex. C at 119: 2-5.)  Plaintiff asserts that it was not important for him to review the financial documents, (id. at 119: 6-8,) because "he was investing in the sale of 3FTI, was not investing in 3FTI for the long term, and was assured by Skokos that 3FTI had sufficient funding to continue its operations until it was acquired."  (Pl. 56.1 Response and Counterstat. ¶ 59.)  Plaintiff did not request an updated financial statement for March 2005 before investing in 3FTI.  (Def. 56.1 Stat. ¶ 62.)

4.      Plaintiff's Investment in 3FTI and the Months Thereafter

On March 30, 2005, Plaintiff wired $4 million to 3F Partners, to purchase a 66 percent interest in 3F Partners as a limited partner.  (Morrison Aff. Ex. C at 116: 13-18; Morrison Aff. Ex. O at 76.)  On April 18, 2005, 3F Partners purchased 3FTI's shares, valued at $2.25 per share. (Morrison Aff. Ex. Y, at 1.)  Plaintiff received approximately 1,777,778 3FTI shares at $2.25 per share, for a total of $4 million.  (Pl. 56.1 Response and Counterstat. ¶ 117.)

On June 12, 2005, Mr. Skokos sent a memo to the limited partners of 3F Partners, including Plaintiff, stating that, during the past six months, 3FTI had received two "letters of

intent" from potential acquirors, but that those proposals were not acceptable to 3FTI.  (Kurtz Aff. Ex. G, at 2.)  After hearing nothing for two months, Plaintiff sent an email to Mr. Skokos on September 22, 2005, stating: "As you know, I borrowed the $[4] million from the bank to pay for 3F.  It was based upon your representations that a sale transaction was imminent and that it would be very helpful to have a balance sheet showing sufficient cash so that a buyer would not try to take advantage of the situation."  (Kurtz Aff. Ex. H.)

On December 27, 2005, Plaintiff contacted Mr. Skokos again to inquire about the progress of 3FTI's efforts to sell itself.  (Morrison Aff. Ex. R.)  Shortly thereafter, Plaintiff was told that 3FTI was in dire need of capital, and had only $13.8 million in funds, notwithstanding that it had had $4 million in cash at the beginning of the year, and had received $6 billion from 3F Partners, and an additional $25 million from a restructuring.  (Pl. 56.1 Response and Counterstat. ¶ 125.)

On January 23, 2006, 3FTI merged with ATS Medical.  (Morrison Aff. Ex. I at 49.)  In connection with the merger, 3FTI exchanged all of its outstanding shares for approximately 19 million shares in ATS Medical.  (Def. 56.1 Stat. ¶ 86.)  Only nine million were actually transferred at the closing, and another 5 million were transferred in December of 2009, leaving approximately 4-5 million shares remaining to be transferred.  (Def. 56.1 Stat. ¶¶ 86-87.)

On April 28, 2010, ATS Medical merged with Medtronic, Inc., in a transaction in which Medtronic agreed to acquire all of the outstanding ATS Medical shares for $4.00 a share. (Morrison Aff. Ex. Z, at § 1.01; Def. 56.1 Stat. ¶88.)  The merger agreement provided that the combined corporation, Medtronic ATS Medical, Inc., would continue to be responsible for ATS Medical's obligation to deliver the remaining 4-5 million ATS Medical shares to the former 3FTI

shareholders, including Plaintiff.  (Id.; Def. 56.1 Stat. at ¶ 88.)  As of June 2010, the ATS

Medical shares held by 3F Partners are valued at $4.00 per share.  (Def. 56.1 Stat. ¶ 89.)

      B.    <u>Procedural History</u>

      On February 13, 2009, Plaintiff filed an amended complaint[4] against 3FTI, based on

federal securities fraud law and New York state common law of fraud and negligent

misrepresentation.  (Morrison Aff. Ex. B.)  In the complaint, Plaintiff alleges that he relied on the

following misrepresentations made by Mr. Skokos, acting as an agent for 3FTI: (1) 3FTI had two

"firm offers" from companies for cash in February 2005; (2) a cash sale for 3FTI for "9 figures"

was "imminent"; (3) Plaintiff's investment in 3FTI would be short-term and without risk; (4)

Plaintiff's investment would result in substantial profit; and (5) 3FTI was in good financial

condition and did not need Plaintiff's cash for working capital, but rather, needed it only to

negotiate the sale from "a position of strength."  (Id. at 8-9.)  Plaintiff alleges that these

statements constitute material misrepresentations amounting to federal securities fraud, because,

at the time that Mr. Skokos made these statements, (1) he knew that 3FTI did not actually have

any serious and acceptable offers for purchase; and (2) he knew that 3FTI was in a precarious

financial situation.[5]  Plaintiff states that, had he known before investing in 3FTI that 3FTI might

_____

[4] Familiarity with the procedural history predating Plaintiff's amended complaint is assumed.

[5] To support his contention that 3FTI was in a precarious financial situation in February 2005,
Plaintiff directs the Court to an email from a 3FTI executive, dated just two days before Mr.
Skokos approached Plaintiff, stating that 3FTI was "running out of money."  (Kurtz Aff. Ex. C.)
To support his contention that 3FTI did not have any serious and acceptable offers for purchase
in February 2005,  Plaintiff directs the Court to an April 18, 2006 proxy filed by ATS Medical
with the Securities and Exchange Commission, stating that:

    From January 2005 through May 2005, [3FTI] . . . management contacted a number of
    companies regarding a potential strategic partnership or acquisition.  Although a few
    companies expressed interest and conducted due diligence, [3FTI] . . .  did not enter into
    any nondisclosure agreements or other similar agreements with any of these companies
    regarding potential acquisition transactions.

run out of money before it could close the sale of the company, he would not have invested in 3FTI.  (Pl. 56.1 Response and Counterstat. ¶ 118.)  Plaintiff seeks damages based on Defendant's wrongful conduct that caused his $4 million investment to be "substantially depleted." (Morrison Aff. B. at 12, ¶ 42.)

On April 1, 2009, Defendant moved to dismiss the Amended Complaint.  On December 2, 2009, the Court granted Defendant's motion to dismiss with regard to Plaintiff's negligent misrepresentation claim, finding that the claim was preempted by New York State's Martin Act. (See Dckt. Entry No. 48.)  With respect to Plaintiff's other claims, the Court found that consideration of materials outside the pleadings was required, and thus converted the motion to dismiss into one for summary judgment.  (Id. at 1-2.)

On June 28, 2010, Defendant filed the instant motion for summary judgment.  Defendant argues, inter alia, that Plaintiff cannot demonstrate reasonable reliance on Mr. Skokos's alleged misrepresentation, because the evidence demonstrates that Plaintiff "is an extremely sophisticated investor who . . . quickly decided without any investigation and without reading the terms of the [the Limited Partnership Agreement] . . . to purchase an interest in 3F Partners." (Def. Mem. at 1.)

## II.     Summary Judgment Legal Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral

---

(Morrison Aff. Ex I. at 45.)  For the purposes of summary judgment, the Court accepts Plaintiff's contention that, at the time he invested in 3FTI, 3FTI was facing financial uncertainty and was not actually entertaining any serious offers for purchase.

part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  A "material" fact is one that might "affect the outcome of the suit under the governing law."  Id.  The moving party bears "the burden of demonstrating that no material fact exists."  Miner v. Clinton County, N.Y., 541 F.3d 464, 471 (2d Cir. 2008) (citing McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007)).

In resolving this inquiry, the Court must construe the evidence in a light "most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 255 (1986)).  In opposing the motion for summary judgment, the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998), or on mere denials or unsupported alternative explanations of its conduct.  See S.E.C. v. Grotto, No. 05-5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006). Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor.  Anderson, 477 U.S. at 255.  To avoid summary judgment, all that is required of the non-moving party is a showing of "sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of truth at trial."  See Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006) (citing Anderson, 477 U.S. at 248-49).

## III.   **Federal Securities Fraud Claim**

To establish liability under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, a Plaintiff must demonstrate by a preponderance of the evidence that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Carlin Equities Corp. v. Offman, No. 07-Civ-359, 2008 WL 4387328, at *5 (S.D.N.Y. Sept. 24, 2008) (citing ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007)).

A.    Legal Standard: Reasonable Reliance

With regard to the fourth element ("upon which the plaintiff relied"), it is well established that a plaintiff bringing a securities fraud claim must establish that he reasonably or justifiably relied on the alleged misstatements or omissions of a material fact.  See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) (emphasis added).  "A showing of justifiable reliance is essential to sustain a securities fraud claim."  Steed Fin. LDC v. Nomura Sec. Int'l., Inc., No. 00 Civ. 8058, 2004 WL 2072536, at *8 (S.D.N.Y. September 14, 2004).  See also Emergent Capital Inv. Mgmt. v. Stonepath Grp., Inc., 165 F. Supp. 2d  615, 622 (S.D.N.Y. 2001) ("Federal securities law . . . require[s] a plaintiff to demonstrate justifiable reliance upon the alleged misrepresentation that forms the basis of the plaintiff's action.").

In evaluating the reasonableness of a plaintiff's alleged reliance, a court considers "the entire context of the transaction," including factors such as (1) the complexity and magnitude of the transaction; (2) the sophistication of the parties involved in the transaction; (3) the investor's access to information and whether that investor engaged in due diligence before investing; and

(4) the content of any agreements between the parties.  Emergent Capital, 343 F.3d at 195.

Combining all of those factors, this Circuit has repeatedly held that an investor does not

reasonably rely on a misrepresentation "if, through minimal diligence, the investor should have

discovered the truth" in situations in which important documents were readily available but not

reviewed, Starr v. Georgeson S'holder, Inc., 412 F.3d 103, 109 (2d Cir. 2005), or where the

plaintiff was a "sophisticated" investor who failed to take reasonable steps to access critical

information related to the transaction in question. See Schlaifer Nance & Co. v. Estate of

Warhol, 119 F.3d 91, 98-99 (2d Cir. 1997). See also Grumman Allied Indus., Inc. v. Rohr Indus.,

Inc., 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major

transactions enjoy access to critical information but fail to take advantage of that access, New

York courts are particularly disinclined to entertain claims of justifiable reliance.").  "Succinctly

put, a party will not be heard to complain that he has been defrauded when it is his own evident

lack of due care which is responsible for his predicament." Lazard Freres & Co. v. Protective

Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997) (citations omitted).  However, a plaintiff's

"long-standing close, personal relationship" with the individual who allegedly made fraudulent

statements, as opposed to an "arms length relationship between client and service provider . . .

may well bolster the [plaintiff's] . . . argument that [his] . . . reliance was reasonable." Parsons &

Whittemore Enter. Corp. v. Schwartz, 387 F. Supp. 2d 368, 374 (S.D.N.Y. 2005).

The reasonableness of a plaintiff's reliance on alleged misrepresentations "is intensely

fact-specific and generally considered inappropriate for determination on a motion to dismiss."

Maloul v. Berkowitz, No. 07-8525, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008).

However, a court should grant summary judgment to a defendant where the court finds that no

rational juror could conclude that a plaintiff's reliance on a defendant's alleged

misrepresentations was reasonable.  See e.g., Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020,

1032-33 (2d Cir. 1993) (finding that there was no justifiable reliance as a matter of law); Steed

Fin., 2004 WL 2072536, at *8 (granting summary judgment after finding that plaintiff's "claim

under Section 10(b) thus fails for lack of reasonable reliance"); Ernest Lawrence Grp. v. Mktg.

Ams., Inc., 2005 WL 2811781, at *6 (S.D.N.Y. Oct. 27, 2005) (granting summary judgment

after finding, inter alia, that "plaintiffs have produced no evidence upon which a reasonable jury

could conclude that any reliance on their part was reasonable").

      B.    Reasonable Reliance: Application of Law to Facts

Defendant argues that this Court should grant summary judgment in its favor because

Plaintiff "cannot demonstrate reasonable reliance as a matter of law."  (Def. Mem. at 17.)

Defendant emphasizes (1) Plaintiff's sophistication as an investor; (2) Plaintiff's failure to read

the materials made available to him; and (3) Plaintiff's failure to investigate or seek additional

material prior to making his investment.  (Id. at 14-17.)  Plaintiff contends that his reliance was

reasonable as a matter of law, and emphasizes (1) his lack of sophistication as an investor; (2) his

lack of access to information; and (3) his long-standing business relationship and friendship with

Mr. Skokos.  (Pl. Opp. at 12-19.)  Plaintiff also asserts that the fact that he did not carefully

review the documents made available to him does not defeat a finding of reasonable reliance.

Construing the facts in the light most favorable to Plaintiff, and thus assuming that Mr.

Skokos knowingly made misstatements of material fact to Plaintiff and intended to induce

reliance thereupon, the Court finds that Plaintiff's reliance on those misrepresentations was not

reasonable as a matter of law, given (1) his sophistication as an investor; (2) his failure to read

the materials made available to him; and (3) his failure to conduct due diligence.

      1.    Plaintiff is a Sophisticated Investor

The undisputed facts show that Plaintiff is a very sophisticated investor with expertise concerning federal securities transactions.  Plaintiff has offered ample evidence that he is an authority on federal securities law and securities transactions; he describes himself as "a leading practitioner in the field of securities, antitrust and consumer litigation," and as "an authority on class and complex litigation, securities fraud and corporate governance."  (Def. 56.1 Stat. ¶¶ 5-6.)  The website for Plaintiff's law firm, which bears his name, states that "the Firm has prosecuted hundreds of securities class actions and derivative actions and has recovered billions of dollars for its clients and class members."  (Def. 56.1 Stat. ¶ 10.)  Plaintiff is a frequent lecturer on securities law.  (Def. 56.1 Stat. ¶ 4.)  Moreover, Plaintiff has invested millions of dollars of his own wealth in bonds and equities.  (Def. 56.1 Stat. ¶¶ 19-23; Morrison Aff. Ex. X.)

Plaintiff contends that his experience does not render him a sophisticated investor because (1) he does not have corporate expertise; (2) he has not invested with private companies like 3FTI; and (3) he did not have knowledge of medical technology companies like 3FTI prior to his investment.  (Pl. 56.1 Response and Counterstat. ¶ 127; Pl. Opp. at 16-17.)

The Court rejects all three of these contentions.  The undisputed facts show that, at the time of his investment with 3FTI, Plaintiff held himself out as an "authority" on corporate issues including "corporate governance."  (Morrison Aff. Ex. C at 17: 2-8.)  Plaintiff has spoken on multiple panels on issues of corporate law, including one entitled "Protecting Mergers and Acquisitions, When Is a Deal Really and Deal?"  (Def. 56.1 Stat. ¶ 7.)  The undisputed facts also show that Plaintiff had knowledge of privately held companies; at the time of his investment, Plaintiff was one of three owners of a privately held company that employed 100 people.  (Def. 56.1 Stat. ¶ 17.)

Finally, the Court rejects Plaintiff's contention that he lacked knowledge concerning medical technology companies.  This contention is belied by the fact that, prior to his investment in 3FTI, Plaintiff represented classes of plaintiffs who sued medical technology companies.  See, e.g., In re Milestone Scientific Secs. Litig., 103 F. Supp. 2d 425, 434 (D.N.J. 2000) (a federal securities class action against a corporation that developed  the "Wand," an "injection system which enables a dental practitioner to more quickly and effectively deliver anesthesia to patients in certain dental applications"); In re Ulttrafem Inc. Secs. Litig., 91 F. Supp. 2d 678,684 (S.D.N.Y. 2000) (a federal securities fraud class action against the creators of "Ultrafem . . . based upon its proprietary and patented SoftCup® Technology . . . to address women's health care needs").[6]

For all of these reasons, the Court finds Plaintiff to be a sophisticated investor.  See Carlin Equities Corp, 2008 WL 4387328, at *7 (finding that plaintiff was a "sophisticated" investor because of "his undisputed years of experience trading securities, managing securities traders, and acting as a part-owner of various companies . . .."); Century Pac., Inc. v. Hilton Hotels, Corp., 354 Fed.Appx. 496, 498 (2d Cir. 2009) (holding that a party's reliance was unreasonable "in light of the fact that . . . [the plaintiff] was a sophisticated party, represented by counsel" ); Drobbin v. Nicolet Instrument Corp., 631 F. Supp. 860, 892 (S.D.N.Y. 1986) ("The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment.") (quoting Hirsch v. du Pont, 553 F.2d 750, 763 (2d Cir. 1977)).

> 2.       Plaintiff's Failure to Review the Documents Made Available to Him

---

[6] Plaintiff directs the Court to testimony from Mr. Skokos stating that Plaintiff "wasn't familiar with medical technology companies and the process [of drug approval]."  (Morrison Aff. Ex. P at 56: 5-6.)  However, Mr. Skokos then testified that he explained the process of how medical technology companies get approval from government regulatory agencies to Plaintiff before Plaintiff invested.  (Id. at 6-7.)

The undisputed facts show (1) that Plaintiff was provided with information relevant to an investor's decision about whether to invest $4 million in a company; and (2) that Plaintiff did not sufficiently review that information.

### i.   The Limited Partnership Agreement

Before investing in 3FTI, Mr. Skokos provided Plaintiff with a copy of the Limited Partnership Agreement.  When asked at deposition whether he "had carefully read" the agreement, he responded "no," and said he failed to do so because he understood that his investment was "relatively riskless."  (Morrison Aff. Ex. C at 106: 21 - 107: 3.)  Plaintiff states: "I'm not sure I even spent more than ten minutes looking at the agreement.  Didn't concern me.  This was not an arms-length transaction where I needed a lawyer to protect myself.  I was dealing with a friend."  (Id. at 103: 17-22.)  Plaintiff chose to instead rely on Mr. Skokos's oral representations "due to their longstanding business relationship and friendship."  (Pl. 56.1 Response and Counterstat. ¶ 47.)

Even assuming that the Limited Partnership Agreement was never signed by Plaintiff,[7] Plaintiff's failure to carefully review the Limited Partnership Agreement before making a $4 million investment in 3FTI, through a partnership vehicle, cuts against a finding of reasonable reliance.  Century Pac. Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 228 (S.D.N.Y.2007) ("[I]f the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means.") (internal citations omitted).

### ii.   3FTI Financial Documents

---

[7] Although Plaintiff now contends he did not make the representations contained in the Limited Partnership Agreement, (Pl. 56.1 Response and Counterstat. ¶ 52,) he testified at deposition that he "believe[d]" that he signed the Limited Partnership Agreement.  (Morrison Aff. Ex. C. at 101: 17-19.)  He also alleged in the parallel Delaware action that the Limited Partnership Agreement is binding.  (Id. at 102: 10-12.)  See supra, note 1.

Before investing with 3FTI, Mr. Skokos also provided Plaintiff with two documents containing 3FTI's year-end financials—the Operating Statement and a Balance Sheet—that showed losses and accumulated deficits for 3FTI.  Plaintiff does not recall reviewing either document.  (Pl. 56.1 Response and Counterstat. ¶ 59.)  Plaintiff now contends that it was not important for him to review those two 3FTI financial documents, because he was making a short term investment, and so the fact that the documents "showed losses is immaterial." (Pl. Opp. at 19-20.)  Plaintiff also argues that the Court should not consider Plaintiff's failure to review the financial statements, because:

> there exists triable issues of fact as to whether (1) the financial statements signified that 3FTI was in financial crisis, given that it was a start-up, and was spending money to develop products with no income; (2) Plaintiff had sufficient understanding of 3FTI's business to attribute meaning to the financial statements, given that Skokos testified that Plaintiff was unfamiliar with the workings of medical companies as 3FTI . . . and  (3) losses on the financial statement give any indication that Skokos's statements concerning "firm offers" were false.

(Id. at 20.)

The Court rejects Plaintiff's contention that the losses revealed by the 3FTI financial documents were "immaterial," simply because Plaintiff was told that there would be a sale "in the very near future" and thus that his investment would be short term.  (Id. at 19.)  The Operating Statement revealed that in 2004 3FTI had had a net loss of $11,242,908.  (Morrison Aff. Ex. G.)  The Balance Sheet revealed that between the end of 2003 and the end of 2004, 3FTI's accumulated deficit had grown from $16,471,832 to $32,207,564.  (Id.)  These are significant figures.  The amount of loss in 3FTI at the time of Plaintiff's investment renders these financial documents relevant to Plaintiff's decision to invest.  Had Plaintiff actually reviewed the 3FTI financial documents provided to him, he may have been more reluctant to rely solely on

Mr. Skokos's oral representations that there would be a sale "in the very near future" when deciding to invest $4 million in 3FTI.[8]

Moreover, even assuming that there are triable issues of fact regarding what Plaintiff would have understood had he reviewed the 3FTI financial documents (which he did not), those facts are not material, because the simple fact that Plaintiff did <u>not</u> review the 3FTI financial documents demonstrates to the Court that Plaintiff's reliance on Mr. Skokos's oral representations was not reasonable.  In assessing the reasonableness of Plaintiff's alleged reliance, the Court must "consider the entire context of the transaction."  <u>Emergent Capital</u>, 343 F.3d at 195.  Here, Plaintiff has conceded (1) that two 3FTI financial documents were provided to him; (2) that he does not recall reviewing either document prior to making a $4 million investment in 3FTI; (3) that he did not know the identity of any offeror; and (4) that he instead relied <u>solely</u> on Mr. Skokos's oral statements.  This is evidence that Plaintiff's reliance was not reasonable.  <u>See</u> <u>Grumman Allied Indus</u>, 748 F.2d 729 at 737 ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.").

### 3.      Plaintiff's Failure to Conduct Due Diligence

The undisputed facts show that, in addition to failing to review the information made available to him, Plaintiff did not seek additional information before investing in 3FTI.

Plaintiff did not request an updated financial statement prior to making his investment. (Def. 56.1 Stat. ¶ 62.)  Nor did Plaintiff ask to see any of the offer letters that Mr. Skokos

---

[8] Moreover, even assuming that Plaintiff had been told that 3FTI would be sold "in the very near future," Plaintiff was also aware of the fact that he did not know the identity of <u>any</u> specific offeror.  Given Plaintiff's expertise in federal securities transactions, he should have understood that the sale of a company that was suffering severe losses could fall through.

referred to in his conversations with Plaintiff.  (Def. 56.1 Stat. ¶ 64.)  Plaintiff states that he

never thought about whether an offer to purchase 3FTI would have been made in writing,

because he "entirely relied on what [Mr. Skokos] told [him]."  (Def. 56.1 Stat. ¶ 65.)  Plaintiff

did not ask Mr. Skokos "anything about the product, or the business, or the FDA status, or timing

of the product or market for the product" that was being developed  by 3FTI.  (Morrison Aff. Ex.

C at 76: 12-14.)  In fact, there is no evidence in the record that Plaintiff asked Mr. Skokos for

any additional documentation, including redacted offer letters from any suitor, board minutes

involving any potential deal, evidence of due diligence performed by a potential acquirer, or any

operative documents that typically accompany acquisitions.  Nor is there evidence that Plaintiff

attempted to obtain this information from others.  Rather, Plaintiff states that he "relied

completely on [Mr. Skokos] saying that [Plaintiff's] investment was for window dressing, and

that it would be very helpful to him and the company if [Plaintiff] would make the investment

quickly and at that time."  (Id. at 76: 14-18.)  This is not reasonable reliance.  See Steed Fin.,

2004 WL 2072536, at *8 (finding that, a plaintiff cannot "support the proposition that it

justifiably relied on any of the alleged misrepresentations . . . in light of plaintiff's failure to

request supplementation of the information furnished"); Granite Partners, L.P. v. Bear, Stearns &

Co. Inc., 17 F. Supp. 2d 275, 290 (S.D.N.Y. 1998) (discussing the "duty on sophisticated

investors to obtain documentation of information material to their investment decisions.").

     Recognizing that he did not attempt to obtain certain documentation before making his

investment, Plaintiff now attempts to raise an issue of fact by suggesting that he was denied

access to information.  (Pl. Opp. at 15-16.)  However, Plaintiff has not offered any evidence that

he was denied access to any information whatsoever.  In fact, when asked at deposition whether

"any information regarding 3F's financials, or the alleged firm offers [was] withheld from you

despite your requests for information," Plaintiff responded, "I can't recall." (Morrison Aff. Ex. C at 164: 8-11.)  When Mr. Skokos refused to reveal the identity of the offerors to Plaintiff, Mr. Skokos told Plaintiff that he was "under a duty of nondisclosure" because the potential offerors were publicly traded companies.  (Morrison Aff. Ex. P at 57: 12-22; 62: 12-19.)  At that point, Plaintiff did not ask to see any non-disclosure agreements between 3FTI and a suitor. [9]  (Pl. 56.1 Response and Counterstat. ¶ 66.)  Instead, Plaintiff relied entirely on Mr. Skokos's oral representations that Mr. Skokos was "fairly certain" that a transaction would close.  (Morrison Aff. Ex. C at 202: 7-9.)

In short, the evidence shows <u>not</u> that Plaintiff was denied access to information, but rather, that Plaintiff did not carefully review the materials that were made available to him, and did not ask to see any additional materials, before investing $4 million in 3FTI.  <u>See</u> <u>Lazard Freres</u>, 108 F.3d at 1543 ("[Plaintiff] was under a further duty to protect itself from misrepresentation.  It could easily have done so by insisting on an examination of the Scheme Report as a condition of closing").[10]

### 4.    Plaintiff's Relationship with Mr. Skokos

Finally, in arguing that his reliance was reasonable, Plaintiff alleges that he and Mr. Skokos "had a longstanding, twenty year business relationship as of 2005," and that he "considered Skokos a friend."  (Pl. Opp. at 14-15.)  Plaintiff cites to decisions holding that an

---

[9] Again, the parties dispute whether 3FTI actually had operating non-disclosure agreements with potential offerors.  (<u>See</u> Pl. 56.1 Response and Counterstat. ¶ 67.)

[10] The decision that Plaintiff cites to, <u>Thomas v. N.A. Chase Manhattan Bank</u>, 1 F.3d 320 (5th Cir. 1993), dealt with "active concealment" by a defendant bank that "affirmatively attempted to block any further investigation" by the plaintiff.  <u>Id.</u> at 325.  The facts in that decision stand in contrast to the instant facts.

investor has less reason to question representations made in a friendship or long-term business relationship, rather than those made in an arms-length transaction.  (See id. at 13-14.)

The Court rejects Plaintiff's contention that his relationship with Mr. Skokos renders his reliance on Mr. Skokos's representations reasonable.  At the time that Plaintiff learned about the investment opportunity with 3FTI, he and Mr. Skokos were communicating "sporadically at best," which Plaintiff defined as only once or twice a year.  (See Def. 56.1 Stat. ¶ 18.)  That fact stands in contrast to the "long-standing close, personal relationship[s]" that courts have considered when evaluating whether reliance on someone else's statements was reasonable.  See Parsons & Whittemore Enter. Corp., 387 F. Supp. 2d at 374.  It is true (1) that Plaintiff and Mr. Skokos served as co-counsel in several cases; and (2) that, through Mr. Skokos, Plaintiff was able to invest in a lucrative cellular license and earn substantial amounts of money.  (Pl. Opp. at 14.)  However, Plaintiff has not explained how these facts justify his investment of $4 million in a company based solely on Mr. Skokos's oral representations.  Specifically, Plaintiff has not shown why his past investment involving Mr. Skokos or his past litigation experiences with Mr. Skokos would lead him to rely solely on Mr. Skokos's oral representations, when making such a significant investment.

Moreover, absent a fiduciary relationship, a personal friendship does not render reasonable reliance on oral representations, without any further investigation.  See Emergent Capital, 343 F.3d at 196 ("Given the sophistication of this financial transaction and of the parties, and absent any allegation of a fiduciary relationship, the personal friendship between Waldron and Hansen does not make appellant's reliance on the alleged extra-contractual representations reasonable.").  Plaintiff has not asserted that there was any fiduciary relationship between himself and Mr. Skokos.

5.      Reasonable Reliance: Conclusion

In conclusion, assuming for purposes of summary judgment that Mr. Skokos knowingly made all of the alleged misrepresentations, and that he intended to induce reliance thereupon, the Court finds that Plaintiff's decision to rely solely Mr. Skokos's oral statements in making a $4 million investment was not reasonable as a matter of law.  See Granite Partners, 17 F. Supp. 2d at 290 ("impos[ing] a duty on sophisticated investors to obtain documentation of information material to their investment decisions");  Lazard Freres, 108 F.3d at 1543 ("[W]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.") (citations omitted).[11]

## IV.    **Common Law Fraud**

The lack of reasonable reliance that defeats Plaintiff's federal securities fraud claim is also fatal to his New York state law fraud claim.[12]  See Shanahan v. Vallat, No. 03 Civ. 3496, 2008 WL 4525452, at *7 (S.D.N.Y. Oct. 3, 2008) (granting summary judgment on plaintiff's common law fraud claim for the same reasons that the court granted summary judgment on plaintiff's federal securities fraud claim); Stuart Silver Assocs., Inc. v. Baco Dev. Corp., 245

---

[11] Defendant presents three additional arguments as to why it should be granted summary judgment: first, that Mr. Skokos's statements are not actionable because they were merely expressions of optimism; second, that Mr. Skokos's statements are not actionable because they were not made with scienter; and third, that Plaintiff cannot demonstrate that he has been damaged.  (Def. Mem. at 17-24.)  Because the Court finds that Plaintiff's reliance on Mr. Skokos's statements was not reasonable as a matter of law, the Court does not need to address Defendant's additional arguments.

[12] The Court dismissed Plaintiff's state law negligent misrepresentation claim in its December 2, 2009 Order.  (See Dckt. Entry No. 48.)

A.D. 2d 96, 99 (1st Dept. 1997) ("As [Plaintiff's] reliance is not reasonable, the existence of a

dispute as to whether Politis made such promises does not create a triable issue on the fraud

claim.").  Accordingly, the Court grants summary judgment on Plaintiff's state law fraud claim.

**V.**     **Conclusion**

  For the foregoing reasons, the Court grants Defendant summary judgment, dismissing all

claims asserted in this action.

  SO ORDERED.

  Dated: New York, New York
  February _18_, 2011

Kimba M. Wood<br>United States District Judge